In re FAIRCHILD INDUSTRIES, INC.
AND GMF INVESTMENTS, INC.
"ERISA" LITIGATION.

No. MDL–822.

United States District Court,
N.D. Florida,
Pensacola Division.

Sept. 9, 1993.

**604**

Barry Richard, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Tallahassee, FL, for Oscar Ray Hall, et al.

James I. Serota, Huber, Lawrence & Abell, New York City, for Fairchild Industries, Inc.

Frederick H. Kopko, Jr., Hugh McBreen, McBreen & McBreen, Chicago, IL, for Peter Dauchy.

Gene Morgan, Registered Agent for GMF Corp., Los Angeles, CA, for GMF.

Bill B. McEachern, Jr., Carlton, Fields, Ward, Emmanuel et al., Pensacola, FL, Barbara Clay, F.D.I.C., Dallas, TX, for FDIC.

Donald H. Partington, Pensacola, FL, for NCNB.

## ORDER AND MEMORANDUM OPINION

VINSON, District Judge.

### I. BACKGROUND

This is an action for breach of fiduciary duty, brought pursuant to the Employee Retirement Income Security Act, Title 29, United States Code, Sections 1001 et seq. ("ERISA"). The plaintiff, NationsBank of Texas, N.A. ("NationsBank"), is now the successor trustee of a pension fund benefiting the employees of Fairchild Aircraft Corporation ("FAC") and Crestview Aerospace ("Crestview"). FAC and Crestview formerly were owned by the defendant Fairchild Industries, Inc. ("Fairchild"). Fairchild sold FAC and Crestview to GMF Investments, Inc. ("GMF") in late 1987. Also named as defendants are the individuals who served on Fairchild's board of directors at the time of the sale of FAC and Crestview (the "Fairchild Directors").

For reasons which are set forth in my order of July 16, 1993, this case went to trial on the breach of fiduciary duty claim (Count III of the Third Amended Complaint). NationsBank alleges that the defendants breached fiduciary duties owed to the beneficiaries of the employee pension plan maintained by Fairchild when Fairchild sold FAC and Crestview to GMF. After considering the pleadings, the parties' stipulations, and the evidence and argument of counsel heard at trial, I make the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

### II. FINDINGS OF FACT

Most of the facts in this matter were not disputed, and are set forth in my order of July 16, 1993. They are restated and modified here to conform to what was proven at trial. Before September 1987, Fairchild was engaged in the manufacture, sale, and repair of commercial aircraft through its wholly-owned subsidiary FAC and its Crestview division. FAC manufactured twin-engine turbo-prop aircraft which were purchased primarily by regional commuter airlines. Crestview manufactured component parts for, and performed modifications on, the aircraft sold by FAC.

Until January 1987,[1] Fairchild had maintained a profit sharing plan for its employees, including employees of FAC and Crestview. Fairchild would make cash contributions to the profit sharing plan, based upon Fairchild's net profit in a given year. This profit sharing plan was composed of two investment funds, referred to as "subaccounts": (1) an Interest Income Subaccount, which consisted of conservative securities such as United States Government obligations and guaranteed income contracts issued by insurance companies;[2] and (2) an Equity Fund Subaccount, which consisted of equity securities issued predominantly by "Fortune 500" companies. Participants in the plan—employees—had the right to designate into which of

---

1. There is some uncertainty in the record as to the date on which the old profit sharing plan was converted into an ESOP. The plan document which established the Fairchild Industries Inc. ESOP is dated October 15, 1986. (Def.'s Ex. 110). However, Lorraine Lewis, who was the manager of Fairchild's employee benefits plans during this time, testified that the effective date of the change from the profit sharing plan to the ESOP was January 1, 1987. (Lewis Dep. at 17).

The precise date is immaterial to the key issues in this case. For purposes of this order, I will accept January 1, 1987, as the effective date of the change.

2. The Interest Income Subaccount is frequently referred to as the "Fixed Income Subaccount" by the parties and by witnesses.

the two funds contributions on their behalf would be made. As a result, these two funds, or subaccounts, were referred to as "member-directed." The assets in these member-directed subaccounts are the focus of this lawsuit.

Effective January 1, 1987, Fairchild converted the profit sharing plan into an employee stock ownership plan (the "Fairchild ESOP").[3] New contributions to the Fairchild ESOP by Fairchild were not made in cash, but in shares of Fairchild stock. However, the Interest Income and Equity Funds were retained as separate subaccounts in the Fairchild ESOP, and plan participants were guaranteed that their individual account balances in the these member-directed funds would continue to be invested in the fund which they had designated. Thus, the older pension plan was essentially "frozen" and the new ESOP was added for all future contributions from Fairchild.[4]

Balances in the "frozen" funds—the Interest Income and Equity Fund Subaccounts—were referred to by several witnesses as "old money," that is, money which was contributed into the old profit sharing plan. By contrast, assets which Fairchild contributed to the ESOP Stock Subaccount after the January 1987 conversion were referred to as "new money." Fairchild continued to maintain the balances in the member-directed accounts of the Fairchild ESOP throughout the period it was negotiating to sell FAC and Crestview to GMF. During the same period, Fairchild continued to serve as sponsor and administrator of the Fairchild ESOP.

In 1987, Fairchild decided to leave the commercial aircraft business by selling FAC and Crestview to GMF. GMF was a venture capital company formed for the purpose of acquiring businesses which were already in existence. GMF was incorporated in January 1987, and the purchase of FAC and Crestview was GMF's first successful acquisition. Following a period of negotiation, Fairchild and GMF executed a purchase agreement for FAC and Crestview on September 30, 1987 (the "Purchase Agreement").

The Purchase Agreement called for a closing date of October 15, 1987. The parties agreed that the transaction was to be financed by a combination of equity investment from the purchaser GMF, debt financing from Citibank, GMF's primary lender, and seller financing from Fairchild. In October and November 1987, however, GMF experienced difficulty in obtaining the necessary financing. According to GMF's principals, the stock market "crash" of mid-October 1987, coupled with a change in lending personnel at Citibank, led Citibank to reevaluate the level of credit it was willing to extend to GMF to complete the purchase. Fairchild made certain financial concessions, and the transaction closed on December 18, 1987. The final purchase price was approximately $48.5 million.

The transaction in its final form required GMF to incur a substantial amount of indebtedness. GMF obtained a $5 million short

---

**3.** An ESOP is a form of employee benefit plan which is designed to invest primarily in securities issued by the company which sponsors the plan. 29 U.S.C. § 1107(d)(6) (1988). Congress has enacted a number of laws which encourage employers to establish ESOPs for the benefit of their employees. *See Donovan v. Cunningham,* 716 F.2d 1455, 1466 n. 23 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

**4.** A third member-directed subaccount, the Company Stock Subaccount, or "Fairchild Stock Subaccount," as it is sometimes called, is mentioned in the Fairchild ESOP plan document. It is unclear from the evidence whether the Company Stock Subaccount existed under the old Fairchild profit sharing plan, or whether it was created when the profit sharing plan was converted into the Fairchild ESOP, in January 1987. Ac-

cording to Armin Brecher, Fairchild's outside ERISA counsel, when the profit sharing plan was converted into the Fairchild ESOP, participants in the plan were given the option of converting funds in their Interest Income and Equity Fund Subaccounts into shares of Fairchild stock. The record does not reflect whether plan participants had this investment option under the old profit sharing plan.

The Company Stock Subaccount consisted of shares of Fairchild stock which were purchased at the direction of individual plan participants. However, the assets in this subaccount were relatively insignificant when compared to those in the Interest Income and Equity Fund Subaccounts. The disposition of the assets in the Company Stock Subaccount was only peripheral to the central issues in this case.

term loan from North American Holding Corporation, which it used to make the initial deposit required by the Purchase Agreement. Citibank, GMF's principal lender, provided a $20 million long-term (approximately two-year) loan, and a $5 million short-term loan. Fairchild, the seller, provided a total of $16 million in the form of two loans: a $10 million two-year loan, and a $6 million short-term, or "bridge" loan.

To evidence the $10 million loan, Fairchild received from Metro Aviation, Inc., a wholly-owned subsidiary of GMF, an unsecured promissory note due December 18, 1989—two years after the closing date of the purchase transaction. The $6 million bridge loan was secured by a right to the proceeds of the sale of six specific airplanes. FAC had entered into sales agreements for these six airplanes at the time of the Fairchild–GMF closing, but the aircraft sales transactions had not yet closed. Both loans made to GMF by Fairchild were fully subordinated to Citibank's loans to GMF. In addition, the Purchase Agreement required Fairchild to maintain certain letters of credit on behalf of FAC.

Soon after closing, the parties turned their attention to certain matters which were left unresolved by the Purchase Agreement. One of these matters was how to transfer the employee pension plans. The Purchase Agreement provided that GMF would establish a new pension plan for the employees of FAC and Crestview (the "GMF Plan"), but the Purchase Agreement did not specify what form the new GMF Plan would take, other than that it would be a defined contribution plan. The Purchase Agreement gave employees of FAC and Crestview an option with respect to their pension funds: each employee could either receive a lump sum distribution of his entire vested account balance in the Fairchild ESOP, or have his entire vested account balance transferred to the new GMF Plan.

The Purchase Agreement did not specify the details of how or when the pension funds would be transferred from the Fairchild ESOP to the new GMF Plan. Several days before the closing of December 18, 1987, GMF's lead negotiator, Fred Kopko, asked Fairchild's lead negotiator and general counsel, John J. McDonnell, if Fairchild would agree to transfer the Fairchild ESOP funds attributable to FAC and Crestview employees to an employee stock ownership plan which GMF intended to establish. Kopko had been told by FAC's vice-president for finance, John Herbots, that the new pension plan being considered by GMF should include an ESOP in order to boost the employee's commitment to the new venture. McDonnell neither agreed to nor opposed Kopko's request, and the closing went forward without the parties resolving this issue.

At some point after the closing, Fairchild and GMF resumed negotiations over the details of the transfer of pension plans. On December 29, 1987, GMF established an employee stock ownership plan for the employees of FAC and Crestview (the "GMF ESOP"). In January 1988, Fairchild and GMF began negotiating an amendment to that section of the Purchase Agreement which dealt with pension plans. GMF requested that the Purchase Agreement be amended to provide that all accrued benefits of FAC and Crestview employees in the Fairchild ESOP be transferred directly to the GMF ESOP without initially offering participants the option to have their benefits distributed in a lump sum cash payment.

For reasons which are discussed below, Fairchild, acting on the advice of its ERISA counsel, Armin Brecher, rejected GMF's proposal of a direct transfer of funds from the Fairchild ESOP to the GMF ESOP. Instead, Fairchild and GMF agreed to "spin-off" into a new ESOP those assets and liabilities of the Fairchild ESOP which were attributable to employees of FAC and Crestview. This spin-off created the FAC/Crestview Employee Stock Ownership Plan (the "FAC/Crestview ESOP"). Upon creation of the FAC/Crestview ESOP, GMF would replace Fairchild as the plan sponsor. According to Gary Howell, ERISA counsel for GMF during the Fairchild–GMF transaction, GMF planned to terminate the FAC/Crestview ESOP immediately after it was "qualified" by the Internal Revenue Service, and replace it with the GMF ESOP which had been established in December 1987.

Both Howell and Richard Coleman, a trust officer for the bank that served as trustee for the FAC/Crestview ESOP, stated that it was intended by GMF that, when the FAC/Crestview ESOP was terminated and replaced by the GMF ESOP, the plan participants—the employees of FAC and Crestview—would be given the option of selling or retaining their shares of GMF stock. Those participants who did not wish to keep their GMF stock would be able to "put" the stock back to the ESOP and receive their account balances in cash. For those participants who wished to retain their GMF stock, their accounts would be transferred into the GMF ESOP. As it turned out, the employees of FAC and Crestview were never given this option.

Fairchild required, as a condition of the spin-off transaction, that an independent trustee be appointed to manage the assets of the newly-established FAC/Crestview ESOP, and that GMF retain this trustee for a period of two years. Fairchild had been advised by its ERISA counsel, Armin Brecher, that an independent trustee was necessary, both to protect the interests of the plan participants and to resolve a potential conflict of interest on the part of Fairchild. While the parties negotiated the mechanics of the transfer of funds between the pension plans, they also searched for someone to serve as trustee for the new FAC/Crestview ESOP. Eventually, in February 1988, Fairchild and GMF agreed to appoint First RepublicBank San Antonio, N.A. ("First Republic–San Antonio") as trustee.

On February 17, 1988, the Fairchild Directors approved, on behalf of Fairchild, the creation of the FAC/Crestview ESOP and the appointment of First Republic–San Antonio as trustee for the new ESOP. The terms of the FAC/Crestview ESOP are identical in all material respects to the Fairchild ESOP. On March 1, 1988, GMF adopted the FAC/Crestview ESOP and agreed to become successor plan sponsor and to substitute its board of directors for Fairchild's board of directors as fiduciaries of the new ESOP.

On March 3, 1988, Fairchild and GMF executed a Third Amendment to the Purchase Agreement (the "Third Amendment"). The Third Amendment deleted the right of FAC and Crestview employees to take a lump-sum distribution of their account balances in the FAC/Crestview ESOP. The reasons for this action were hotly-disputed, and are discussed in the next section. The Third Amendment was suggested to Fairchild by its ERISA counsel, Armin Brecher, who drafted it and negotiated its terms with GMF's ERISA counsel, Gary Howell. The Third Amendment named First Republic–San Antonio as trustee for the FAC/Crestview ESOP and required GMF to retain First Republic–San Antonio as trustee of the new ESOP for a two-year period. The Third Amendment also contained a provision which indemnified Fairchild against any claims from participants arising out of the transfer of funds between the ESOPs.

On March 4, 1988, all agreements were in place to finalize the transfer of funds between the pension plans. Fairchild and First Republic–San Antonio executed the Trust Agreement appointing the latter as trustee of the assets of the FAC/Crestview ESOP. The trust officer at First Republic–San Antonio who was responsible for the FAC/Crestview ESOP, Richard Coleman, directed Mellon Bank—the trustee of the Fairchild ESOP—to forward the cash and securities attributable to the FAC and Crestview employees to First Republic–San Antonio. Fairchild simultaneously directed Mellon Bank to do the same.

At the time of the transfer, the bulk of the assets were in the Interest Income and Equity Fund Subaccounts. On March 8, 1988, Mellon Bank, trustee of the Fairchild ESOP, transferred the liquidated balances—attributable to the accounts of the FAC and Crestview employees—of the Interest Income and Equity Fund Subaccounts of the Fairchild ESOP to First Republic–San Antonio, as trustee for the FAC/Crestview ESOP. Mellon Bank transferred cash in the amount of $2,333,836.80, which was the liquidated balance of the Interest Income Subaccount, and cash in the amount of $793,024.44, which was the liquidated balance of the Equity Fund Subaccount.

On March 8, 1988, the day of the transfer of the Interest Income and Equity Fund

Subaccounts assets, First Republic–San Antonio transferred $2,280,000.00 from the FAC/Crestview ESOP account to GMF, as consideration for the purchase of 22,800 shares of GMF common stock. The agreement to sell and purchase the GMF stock had been negotiated by GMF and Coleman, as trust officer for First Republic–San Antonio, prior to March 4, 1988, the date on which First Republic–San Antonio became trustee for the FAC/Crestview ESOP. The sale and purchase agreement for the GMF stock was executed on March 4, 1988.

Thus, as of March 8, 1988, the bulk of the assets and liabilities of the Fairchild ESOP that were attributable to FAC and Crestview employees had been transferred to the FAC/Crestview ESOP. GMF replaced Fairchild as the plan sponsor of the FAC/Crestview ESOP, and GMF's board of directors replaced Fairchild's board of directors as fiduciaries of the FAC/Crestview ESOP. First Republic–San Antonio was appointed trustee of the funds in the FAC/Crestview ESOP. After being appointed trustee, First Republic–San Antonio used $2,280,000.00 in FAC/Crestview ESOP funds—approximately two-thirds of the funds which had been transferred from the Interest Income and Equity Fund Subaccounts of the Fairchild ESOP— to purchase 22,800 shares of GMF common stock.

The trustee retained the remaining one-third of the funds in a money-market account. According to Howell, GMF's ERISA counsel, and Coleman, trust officer at First Republic–San Antonio, John Herbots, FAC's vice president for finance, and Paul Granato, FAC's director of employee benefits, predicted that approximately one-third of the plan participants would choose to cash out their balances in the FAC/Crestview ESOP when they were given this option. Thus, the trustee used two-thirds of the assets to purchase GMF stock and retained one-third.

Later in March, on either March 11 or March 15, First Republic–San Antonio, as trustee for the FAC/Crestview ESOP, received the remaining assets of the Fairchild ESOP which were attributable to the FAC and Crestview employees. These consisted of 9,304 shares of Fairchild stock which had

been in the "ESOP Stock" account of the Fairchild ESOP, and 7,291 shares of Fairchild stock which had been in the "Fairchild Stock Fund" account of the Fairchild ESOP. First Republic–San Antonio sold these 16,595 shares of Fairchild stock for a total price of $143,044.12 and deposited these funds in a money-market account.

Subsequently, in April 1988, North American Ventures, Inc., made a tender offer for all shares of GMF at a price of approximately $130 per share. The management of FAC responded with a series of competing offers for GMF, precipitating what the defendants have characterized as an "internecine war between the management of FAC and the board of directors of GMF." In June 1988, the entire management of FAC was fired by GMF. According to Fred Kopko, a member of GMF's board of directors during this time, FAC's management team—Tom Smith, John Herbots, and Dave Bartles—were trying to "sabotage" the company. That same month, Citibank, GMF's primary lender, declared GMF in default on certain capital requirements of its loan agreements. On February 1, 1990, FAC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. In December 1990, GMF filed a Chapter 11 petition. GMF has emerged from bankruptcy and is currently in the process of liquidating its assets for distribution to its shareholders.

Prior to July 29, 1988, First RepublicBank Corporation ("First Republic"), the parent corporation of First Republic–San Antonio, was declared insolvent. The Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver of First Republic and twenty-seven banks owned by it, including First Republic–San Antonio. On July 29, 1988, the FDIC sold certain assets and transferred certain liabilities of First Republic to J.R.B. Bank, N.A. As a result of this transfer, J.R.B. Bank became the successor trustee of the FAC/Crestview ESOP. J.R.B. Bank later changed its name to NCNB Texas National Bank, N.A. ("NCNB"). NCNB subsequently changed its name to NationsBank of Texas, N.A.

In September 1989, two employees of FAC and Crestview, Oscar Ray Hall and Delbert

Hemmen, filed in this court a class action complaint against Fairchild and GMF. Hall and Hemmen alleged violations of ERISA and of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. §§ 1961 et seq.]. NCNB filed a similar complaint in the United States District Court for the Western District of Texas (the "Texas action"). Named as defendants in the Texas action were Fairchild, the Fairchild Directors, GMF, members of the board of directors of GMF, and Metro Aviation, Inc., a wholly-owned subsidiary of GMF. Pursuant to order of the Judicial Panel on Multidistrict Litigation, the Texas action was transferred to this court on December 5, 1989. The Texas action and the class action were consolidated into the present proceeding.

By order of December 28, 1990, 768 F.Supp. 1528, I dismissed all counts of the class action complaint, with the exception of the breach of fiduciary duty claim. Hall and Hemmen subsequently withdrew their application for class certification, and NCNB adopted the class action complaint now styled NCNB's Second Amended Complaint. The plaintiffs settled their claims against GMF, the GMF Directors, and Metro Aviation, Inc., in December 1991, and these claims were voluntarily dismissed on February 27, 1992.

Upon stipulation of the parties, the complaint filed by Hall and Hemmen was dismissed on March 3, 1993, and a Third Amended Complaint was filed by Nations-Bank. All prior rulings with regard to the prior complaints carry over and apply to the same counts of the Third Amended Complaint. All pending motions made with respect to the Second Amended Complaint applied to the Third Amended Complaint. The parties' motions for summary judgment on the breach of fiduciary duty claim—the sole remaining claim—were denied by order of July 16, 1993.

## III. *CONCLUSIONS OF LAW*

This case went to trial on the issue of whether the defendants breached the fiduciary duties they owed to the employees of FAC and Crestview as beneficiaries of the Fairchild ESOP. The essence of NationsBank's claim is that the defendants breached their fiduciary duties of loyalty and prudence by executing the Third Amendment, which deleted the plan participants' right to a lump sum distribution, and transferring the assets of the Fairchild ESOP to the FAC/Crestview ESOP with knowledge that these assets would be used, in part, to purchase GMF stock.

My conclusions of law as to the fiduciary duties owed by the defendants are set forth in my order of July 16, 1993, Section II.B., pp. 15–16. It is unnecessary to repeat them here. To the extent the defendants exercised control over the Fairchild ESOP and the FAC/Crestview ESOP, they acted as ERISA fiduciaries. As fiduciaries, they were obligated to act prudently and with loyalty to the plan participants. In denying the motions for summary judgment, I identified three genuine factual issues which prevented a conclusion as to whether the defendants discharged these duties. The proof at trial resolves these factual issues and leads me to conclude that Fairchild did not breach its fiduciary duties.

■ First, it is clear from the evidence offered at trial that the defendants did not act with an improper motive when they amended the Purchase Agreement to delete the plan participants' lump sum distribution option. NationsBank maintains that GMF wanted the lump sum distribution option taken away from the plan participants so that GMF could have ready access to the funds in the Fairchild ESOP. Because the lump sum distribution option stood in the way of the GMF ESOP or the FAC/Crestview ESOP purchasing GMF stock, so this argument goes, GMF wanted that option removed. I find that this characterization of events was not borne out by the proof at trial.

Instead, I am satisfied that Fairchild deleted the lump sum option in order to avoid disqualification of the Fairchild ESOP. The lump sum provision, section 9.2 of the Purchase Agreement, was subject to an important caveat:

Effective as of the date of Closing, Buyer shall establish a new defined contribution plan ("New Plan C"). Once New Plan C has been established, Fairchild shall of-

fer each employee of the Subject Entities who is to be employed by Buyer immediately after the Closing the opportunity to receive payment of his entire vested account balance(s) under the following Pension Plans (*unless, in the opinion of legal counsel to Fairchild, such payment would not be permitted as a matter of law*)
. . . .

(Def. Ex. 102, Tab 2 at 30) (emphasis added). Armin Brecher, Fairchild's outside ERISA counsel, who was not involved in the drafting of section 9.2, advised Fairchild that the lump sum option "would not be permitted as a matter of law."

Correspondence between Lorraine Lewis, the manager of Fairchild's employee-benefits programs, and Brecher, indicates that as early as October 1987, both Fairchild and GMF were concerned that lump sum distributions to employees might disqualify the Fairchild ESOP. Brecher testified at length about this concern. At the time of the transaction, the Internal Revenue Service had issued rulings which prevented any participant in a qualified pension plan from withdrawing funds from that plan within two years after those funds had been contributed by the employer. In this case, every employee of FAC and Crestview, as well as every other Fairchild employee, had funds in the Fairchild ESOP which had been contributed within the previous two years.

An exception to this rule applies when a participant receives a distribution from a qualified plan in connection with a separation of that participant's service, or employment, with the plan sponsor. Such distributions in connection with separation of service are subject to favorable tax treatment and do not jeopardize the qualification of the plan itself. *See* 26 U.S.C. 402(e)(4)(A). The Internal Revenue Service takes the position, however, that a distribution to an employee which occurs during a corporate reorganization or liquidation in which the employee remains in the same job, but employed by a different entity, does not qualify as a distribution on account of a separation of service. *See* Rev. Rul. 79–336, 1979–2 C.B. 187; Rev.Rul. 80–129, 1980–1 C.B. 86. The Service's position is that an employee is "separated from the service of the employer," for purposes of Section 402(e)(4)(A) of the Internal Revenue Code, only upon death, retirement, resignation, or discharge, and not when that employee continues on the same job for a different employer after a reorganization or liquidation of the former employer. Rev.Rul. 80–129, 1980–1 C.B. 86. This is known as the "same desk rule."

Section 9.2 of the Purchase Agreement, as originally drafted, would have permitted in-service, as opposed to separation of service, distributions to those employees who chose a lump sum payment of their account balances. Brecher was concerned that, in Private Letter Rulings, the IRS had indicated that distributions from a qualified plan to an employee as an "in-service distribution" would not only make the distribution taxable as income and subject to the distribution penalty, but also could disqualify the entire plan. Disqualification of the plan would have resulted in a loss of tax benefits for all Fairchild employees who participated in the plan, as well as the loss to Fairchild of the deductibility of contributions to the plan.

Understandably, Brecher characterized the tax consequences of disqualification as "disastrous." Brecher advised Fairchild that it should avoid such a result by amending the Purchase Agreement to delete the lump sum distribution option. I am convinced that this was the reason that Fairchild negotiated and executed the Third Amendment, and that it acted prudently in doing so. While the deletion of the lump sum option also may have eliminated a securities law problem,[5] the tes-

---

5. Soon after closing, Howell, GMF's ERISA counsel, discovered that the lump sum distribution provision of the Purchase Agreement, as applied to a GMF ESOP holding GMF stock, presented a securities law problem. The lump sum option would have given each employee the choice between receiving the balance of his account in the Fairchild ESOP in cash or investing it in GMF stock. This provision would have violated federal securities laws because it would have given employees an investment choice in an unregistered security, namely, GMF stock. Howell stated that when this provision was drafted in September 1987, the parties had relied on advice from a securities attorney in his law firm. That attorney had advised Howell that an exemption

timony of Brecher and Howell, who negotiated the Third Amendment, shows that Fairchild's paramount concern was to avoid a serious problem with the Internal Revenue Service that could disqualify the plan.

■ Second, I conclude that it was not proven that the defendants knew, or should have known, that GMF intended to use funds in the member-directed accounts of the Fairchild ESOP to purchase GMF stock. In fact, the evidence established the opposite, that the defendants believed that the member-directed funds could not be used to purchase GMF stock without the express direction of the participants in the plan.

Fairchild learned in December 1987, shortly before the closing, that GMF was interested in establishing an ESOP for the FAC and Crestview employees. Kopko, GMF's lead negotiator, asked McDonnell, Fairchild's general counsel and lead negotiator, if Fairchild would agree to transfer the Fairchild ESOP funds attributable to FAC and Crestview employees to an ESOP which GMF planned to set up. Kopko relayed what he had been told by Herbots, FAC's vice-president for finance, that the employees wanted an equity stake in the new venture. McDonnell neither agreed to nor rejected Kopko's request. Rather, McDonnell told Kopko that attorneys for both sides would have to look into this matter. This discussion was in general terms, and there is no evidence that anything was said which suggested that GMF contemplated using any member-directed funds to purchase GMF stock. McDonnell learned that an ESOP was one component of the pension plans which GMF was considering, but the evidence reflects that was the extent of his knowledge at that point.

The mechanics of the pension plan issue were taken up by Brecher and Howell, the parties' ERISA counsel. Howell proposed, on behalf of GMF, a direct transfer of assets from the Fairchild ESOP to the GMF ESOP. Howell informed Brecher that some portion of the assets which were transferred would be used to purchase GMF stock. Howell and Brecher did not discuss the specifics of which

funds would be used to purchase GMF stock, or of how much GMF stock would, or might, be purchased by the GMF ESOP. There was no mention of using funds in the member-directed accounts to purchase GMF stock.

Brecher advised Fairchild against the direct plan-to-plan transfer proposed by Howell. Rather, Brecher advised that the only way to protect the interests of the plan participants was to spin-off into a new ESOP those assets of the Fairchild ESOP which were attributable to the FAC and Crestview employees, and to appoint an independent trustee to manage the assets of the spin-off plan. Brecher also realized, and alerted Fairchild accordingly, that GMF's proposal presented a potential conflict of interest for Fairchild. Fairchild had a vested interest in the future success of GMF, for, among other reasons, GMF had given Fairchild a $10 million subordinated note as part payment for the purchase of FAC and Crestview. An infusion of cash into GMF which would result from the purchase of GMF stock by the GMF ESOP would thus inure to the benefit of Fairchild, a subordinated creditor of GMF.

Acting on the advice of Brecher, Fairchild agreed to the spin-off plan/independent trustee approach. Brecher, who had drafted the Fairchild ESOP plan documents in 1986, drafted the FAC/Crestview ESOP Plan and Trust Agreement. The material provisions of the spin-off plan were identical to those of the Fairchild ESOP, with the exception of the governing law designation. Thus, the FAC/Crestview ESOP was essentially a clone of the Fairchild ESOP. Therefore, the FAC/Crestview ESOP duplicated the investment options which had existed in the Fairchild ESOP.

Brecher explained the limits on the trustee's discretion to invest the funds in the Fairchild ESOP. Fairchild had converted from a defined benefit pension plan to a defined contribution plan by establishing the Fairchild ESOP in January 1987. The assets of the Interest Income and Equity Fund

from registration would apply, so that the lump sum option could be implemented without first registering GMF stock. After closing, however,

Howell discovered that the exemption which they had earlier relied upon would not apply.

Subaccounts on that date were "frozen," in that no new contributions would be made to those subaccounts. According to Brecher and all of Fairchild's witnesses who were asked about the subject, the trustee of the Fairchild ESOP lacked the discretion to purchase Fairchild stock with the "old money" subaccounts unless individual plan participants so directed.

Brecher, McDonnell, and Mortimer Caplin, a Fairchild Director (and formerly Commissioner of Internal Revenue), all testified that they believed that the integrity of the member-directed funds—the "old money"—was protected in the FAC/Crestview ESOP just as those funds had been protected in the Fairchild ESOP. All testified that they believed that the FAC/Crestview ESOP Plan and Trust Agreement prevented member-directed funds from being invested in GMF stock without the express direction of the participants, just as the Fairchild ESOP Plan had prevented their investment in Fairchild stock without member-direction. The provisions of the FAC/Crestview Plan Trust Agreement support their interpretations.

As stated above, the account provisions of the FAC/Crestview ESOP mirrored the corresponding provisions of the Fairchild ESOP. Brecher explained how, in his opinion as the drafter of both plans, those provisions, along with the FAC/Crestview Trust Agreement, protected the "old money" accounts. Section 13.01 of both plans governs the investment of ESOP funds in stock of the plan sponsor. It provides:

> The assets of the Discretionary Contribution Accounts shall be invested primarily in Company Stock if and to the extent shares are available. Assets in all Accounts in the Plan may be used to acquire shares of Company Stock from shareholders (including Members) or from any Plan Sponsor....

(Def.'s Ex. 110 at 91; Def.'s Ex. 54 at 49). The "Discretionary Contribution Accounts" referred to in section 13.01 consist of new contributions to the ESOP made by the em-

ployer—either Fairchild or GMF. Under both plans, employer contributions, "new money," *shall be* invested primarily in employer stock.

The member-directed accounts are governed by section 13.03 of both plans, which provides:

> (a) Each member shall direct the Trustee as to the manner in which contributions to his Voluntary Contribution Account are invested, by written election delivered to the Plan Administrator specifying in multiples of 25% the allocation of his contributions between the Company Stock Subaccount, Equity Fund Subaccount, and Interest Income Subaccount. A Member may change his investment election once during each Plan Year by written notice delivered to the Plan Administrator....

> (b) Each Member may, at one time during a Plan Year as of a Valuation Date, elect to transfer, in multiples of 25%, the balance of his Voluntary Contribution Account, Old Company Contribution Account, and Old Participant Contribution Account between the Equity Fund Subaccount, Interest Income Subaccount and Company Stock Subaccount....

(Def.'s Ex. 110 at 98–99; Def.'s Ex. 54 at 53–54). The "Voluntary Contribution Account" consists of contributions made to the plans by employees after January 1, 1987, the date on which the old Fairchild profit sharing plan was converted to the Fairchild ESOP. The "Old Company Contribution Account" and "Old Participant Contribution Account" consist of contributions made by Fairchild and by participants—employees—under the old Fairchild profit sharing plan, which was converted to an ESOP in January 1987.[6] These are the two accounts that were frozen in place in January 1987 and were referred to by Brecher and others as the "old money" accounts. The provisions of the FAC/Crestview ESOP, which are identical to the Fairchild ESOP, were thus understood by the defendants to freeze the old money accounts in place again in February 1988, the time of

---

6. Both the Fairchild ESOP and the FAC/Crestview ESOP provide that the "Old Participant Contribution Account and the Old Company Contribution Account shall consist of a Company Stock Subaccount, an Equity Fund Subaccount and an Interest Income Subaccount." (Def.'s Ex. 110 at 3; Def.'s Ex. 54 at 2).

the spin-off. Section 13.01 authorized the investment of old money in company stock, but only if a member of the plan so directed, pursuant to section 13.03.

The investment discretion of the FAC/Crestview ESOP trustee is set forth in section IV of the Trust Agreement, which provides:

> (a) Subject to the provisions of this Section IV and Section 13.03 of the Plan, the Trustee agrees to invest the assets of the fund with the care, skill and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters pursuant to the Trust would use in the conduct of an enterprise of a like character and with like aims.
>
> (b) The investment goals and objectives of the Plan are to invest primarily in shares of the Corporation's common stock except as provided in Section 13.03 of the Plan....
>
> (c) Notwithstanding any language in the Trust to the contrary, the Trustee shall have the authority to invest up to 100% of the trust fund in any securities issued by an Employer....

(Def.'s Ex. 47 at 6). Under the plain language of section IV of the Trust Agreement, the Trustee's investment discretion is limited by section 13.03 of the Plan, which gives employees control over member-directed accounts. The defendants understood this to operate as a bar to the trustee investing member-directed funds in company stock without explicit member-direction. This is certainly what these provisions expressly set out, and they do so in language that experienced practitioners see regularly in such plan documents.

The plaintiffs are correct, however, that any limit on the trustee's investment discretion is rendered somewhat uncertain by section IV(c). On its face, section IV(c) seems to grant the trustee unlimited authority to invest in company stock. As Brecher explained, however, section IV(c) is only the standard clause included in all ESOP plans

to override the diversification requirements of ERISA, which a trustee who administers an ESOP must be allowed to disregard.[7] It is undisputed that the language of section IV(c) is generic and is routinely used in ESOP trust agreements to make it clear to the trustee of an ESOP that it is not bound by the diversification requirement. This section was neither intended nor understood by Fairchild to abrogate the employees' control over member-directed accounts. That is, the trustee was authorized to invest member-directed funds in company stock *only if* the members so directed.

I find that this is the only reasonable interpretation of the FAC/Crestview Plan and Trust Agreement. To interpret section IV(c) as granting the Trustee unlimited authority to invest all ESOP funds in company stock would render meaningless the member-directed account provisions of section 13.03 of the Plan. The Trust Agreement explicitly provides that the Trustee's discretion over plan assets is subject to section 13.03 of the Plan. Section IV(c) of the Plan only allows the trustee to invest in employer securities *"[n]otwithstanding any language in the Trust."* In other words, it does not permit the trustee to disregard the controlling provisions *of the Plan,* a separate document. Together, these provisions were clearly intended to grant the trustee *authority* to invest all ESOP funds in company stock, subject to the rights of employees to control the investment of member-directed funds. This was the intent and understanding testified to by Brecher. That understanding is supported by a fair reading of the Plan and Trust Agreement. It is consistent with the testimony of other witnesses who understood that the member-directed funds were protected in the spin-off plan just as they had been in the Fairchild ESOP.

This was McDonnell's understanding of the effect of the spin-off approach to transferring plan assets. McDonnell, Fairchild's general counsel, testified that he understood that the spin-off plan would mirror the Fairchild

---

**7.** ERISA imposes upon fiduciaries the duty to diversify the investments of the plan "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C) (1988). This diversification requirement is not violated by an investment in employer securities by an ESOP. 29 U.S.C. § 1104(a)(2).

ESOP, and that the FAC and Crestview employees would have the same right to direct the investment of their funds under the new plan as they had under the old. Most importantly, McDonnell understood that only the assets of the ESOP Stock Subaccount would be available for the purchase of GMF stock, and that this amount was a relatively small portion of the total funds in all the subaccounts of the spin-off ESOP. It was McDonnell's understanding that most of the assets were in the member-directed accounts, and that these assets could not be used to purchase company stock without the employees so directing.

This same understanding was communicated to the Fairchild Directors when the spin-off transaction was submitted for their approval. The Fairchild Directors approved the FAC/Crestview ESOP and the Trust Agreement at the February 17, 1988 board meeting. Before that meeting, the board members were provided copies of a memorandum from Donald S. Parker, Fairchild's deputy general counsel, which explained the effect of the ESOP spin-off. This memo advises the board members that:

> Pursuant to an agreement with the purchaser of FAC and related units, we are establishing a "mirror" ESOP plan, into which the assets relating to the employees of the sold units will be transferred. The mirror plan will be identical to the old plan in its terms, other than it will use as its trustee a major Texas bank, First Republic Bank San Antonio, N.A.

> This mechanism facilitates the investment by employees, if they choose, in GMF stock. There is no obligation on their part to so invest.

(Def.'s Ex. 156).

Mortimer Caplin, a Fairchild Director, explained the directors' understanding of the spin-off transaction. Caplin testified that he was kept fairly current on the pension plan aspects of the Fairchild–GMF deal by then-chairman of the board Emanuel Fthenakis, as well as McDonnell and Parker from Fairchild's legal department. According to Caplin, the directors were assured before, and during, the February 17, 1988, meeting that the separate subaccounts of the Fairchild

ESOP were retained in the spin-off ESOP. As to the member-directed accounts, the directors were assured that these were frozen in place in the spin-off ESOP and could not be used to purchase GMF stock without the participants so choosing. Caplin testified that it was his understanding that it would have been a breach of the Trust Agreement for the trustee to invest the "frozen funds" in GMF stock without direction from the employees. In Caplin's words, it was his belief that these funds were "sacrosanct."

Thus, far from having knowledge that the FAC/Crestview ESOP trustee would use member-directed funds to purchase GMF stock, the defendants reasonably believed that the trustee was prohibited from making such an investment without specific direction from the plan participants. All of the witnesses who testified on this subject stated that they believed that the assets in the Interest Income and Equity Fund Subaccounts—the "old money"—were protected when the FAC/Crestview ESOP was spun-off from the Fairchild ESOP. This belief was based on their own knowledge of the Fairchild ESOP, as well as assurances from Brecher, an experienced and competent ERISA attorney who drafted both plans, that the plans were identical in all material respects. No evidence was offered to suggest that the defendants knew, or had reason to know, that GMF and the FAC/Crestview trustee were contemplating a purchase of GMF stock with member-directed funds.

This brings me to the final issue to be resolved: whether the defendants discharged their fiduciary duties by selecting a neutral, competent trustee to manage the FAC/Crestview ESOP. As I stated in the order denying summary judgment, I viewed this to be the most important issue remaining for trial. The evidence at trial showed that the defendants, too, recognized the paramount importance of selecting an independent, competent trustee to oversee the funds in the spin-off ESOP.

 The defendants were presented with a conflict of interest when GMF requested a direct transfer of assets from the Fairchild ESOP to the GMF ESOP. Fairchild obvi-

ously knew that a portion of those assets—excluding the member-directed funds—might be used to purchase GMF stock. Such a stock purchase would benefit Fairchild, who was at that time a subordinated creditor of GMF. At the same time, Fairchild remained the plan sponsor of the Fairchild ESOP, and was, therefore, a fiduciary of the plan beneficiaries. When a fiduciary finds itself in such a position of divided, or conflicting, loyalties, a proper course of action may be to step aside in favor of a neutral, competent referee. *See Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Sommers Drug Stores v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1469 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987); *Leigh v. Engle*, 727 F.2d 113, 125 (7th Cir.1984).

■ That is exactly what Brecher advised. Brecher informed Fairchild, by memorandum [Pl.'s Parker Ex. 2], of the case law arising out of *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), which indicated that when there is a conflict of interest, the fiduciary should consider stepping aside and selecting an independent trustee to make the investment decision. This same memorandum also discussed a case with similar facts to the transaction proposed by GMF. In that case, *Eaves v. Penn*, 426 F.Supp. 830 (W.D.Okla.), *aff'd*, 587 F.2d 453 (8th Cir. 1976), a seller was held to have breached its fiduciary duty by transferring pension plan assets directly to a buyer, rather than to an independent trustee.

Brecher advised Fairchild that the only way to adequately protect the interests of the plan participants was to spin-off the plan assets attributable to FAC and Crestview employees and appoint an independent trustee to manage the spin-off plan. Brecher further advised that GMF should be required to maintain the independent trustee for a period of two years. Brecher testified that it was important for the trustee to remain in place for a substantial period of time, because if the purchaser—GMF—was inclined to use plan assets for its benefit, it would do so relatively soon after the transfer of those assets. Brecher believed that two years was a sufficiently long period to guard against a raid on plan assets by the purchaser.

Fairchild refused to compromise the two-year requirement in negotiating with GMF the particulars of the spin-off transaction. The first draft of the Third Amendment, which was prepared by Brecher, included a provision that the trustee remain in place for two years. On March 1, 1988, Howell, GMF's ERISA counsel, sent a redrafted version of the Third Amendment to Parker, Fairchild's deputy general counsel, who passed the document on to Brecher for review. (Def.'s Ex. 20). Brecher's then-associate, Steven Schaffer, discovered that the two-year requirement had been omitted from this version of the Third Amendment. A handwritten note from Schaffer to this effect appears in the margin of the draft which was sent to Brecher. Brecher then informed Parker that GMF's proposed Third Amendment was unacceptable because of the omission. Either Parker or Brecher then advised Howell that Fairchild would not go forward with the spin-off transaction without GMF agreeing that the trustee would remain in place for two years. The Third Amendment was executed in its final form with the two-year requirement in place.

The evidence also established that Fairchild took reasonable steps to insure that the trustee they appointed was both independent and competent. Early on, Brecher and Parker established certain criteria which they would use to select a trustee. They required that the trustee be a prominent bank of substantial size, preferably with assets in excess of $1 billion, with a reputation for integrity, and expertise in the administration of pension plans, specifically ESOPs.

Brecher suggested that First Republic-Bank Dallas ("First Republic–Dallas") be appointed trustee, and he prepared drafts of a trust agreement and Third Amendment to the Purchase Agreement naming First Republic–Dallas as trustee. Brecher also contacted Martin Weiland, a trust executive at First Republic–Dallas, and discussed the possibility of First Republic–Dallas serving as trustee. Brecher knew first-hand of First

Republic–Dallas' expertise and integrity in the area of pension plan management.

Brecher had been retained by Fairchild in 1986 in connection with an attempt by FAC management to purchase FAC via a leveraged buy out in which an ESOP plan would be the key financing tool. RepublicBank of Dallas, the predecessor of First Republic–Dallas, was to be the trustee of that ESOP. RepublicBank hired an independent valuation firm, Houlihan, Lokey, Howard & Zukin ("Houlihan, Lokey"), to perform a valuation of FAC, so that RepublicBank could evaluate the offer which the management team had made Fairchild. Acting upon the Houlihan, Lokey valuation, RepublicBank determined that the management offer was too high and refused to approve the offer on behalf of the ESOP. According to Brecher, this experience convinced him that RepublicBank was an independent, competent, and trustworthy fiduciary, one that would not "get caught up in the exigencies of a transaction."

Fairchild's principals had the same opinion of First Republic–Dallas and its predecessor. All testified that they believed First Republic–Dallas to have been a trustee of substantial expertise and integrity. Brecher learned from Howell, however, that the FAC management team wanted a local bank in San Antonio, specifically First Republic–San Antonio, to serve as trustee for the FAC/Crestview ESOP. Howell explained that FAC management wanted a local bank to handle the day-to-day operations of the pension plan, so that administrative functions such as record-keeping, accounting, and allocation would be done in proximity to FAC's headquarters in San Antonio. Brecher was concerned that First Republic–San Antonio did not have the level of experience with ESOP plans that Fairchild desired. Brecher relayed his concern to Howell and to Parker, Fairchild's deputy general counsel. According to Brecher, this became a "stumbling block" in his negotiations with Howell.

Brecher then discussed the matter with Martin Weiland, senior vice-president at First Republic–Dallas, and James Paschall, who was then a trust account executive at First Republic–Dallas. According to Brecher, Weiland and Paschall assured him that, while First Republic–San Antonio would be designated the trustee and would handle administrative functions—as FAC management desired—First Republic–Dallas would supervise any investment decisions under an "agency agreement." [8] It was Brecher's understanding that the banks in the First RepublicBank system had centralized their trust operations and that investments were handled by the much larger and more experienced First Republic–Dallas.

Brecher's testimony as to some of the assurances he received from First Republic–Dallas was disputed by James Paschall. Paschall testified that he and Brecher discussed the possibility of First Republic–Dallas serving as trustee, with an "agency agreement" to allow First Republic–San Antonio to handle local administration. According to Paschall, he never assured Brecher that First Republic–Dallas would supervise investment decisions if First Republic–San Antonio was named as trustee. It appears that while Paschall was considering the "agency agreement" as a means of facilitating local administration in San Antonio, Brecher was considering it as a means of utilizing the experience and expertise of Dallas.

It is not disputed, however, that *Brecher assured Fairchild* that the full trust department resources of the First RepublicBank system would be available to the FAC/Crestview ESOP, and that investment decisions would be supervised by First Republic–Dallas. Caplin testified that the members of the board of directors were told by management, and by Parker, the deputy general counsel,

---

8. First Republic–Dallas and First Republic–San Antonio were both wholly-owned by First RepublicBank Corporation, a bank holding company. The two entities were not "branch" banks in the legal sense of the word, because Texas law at that time prohibited branch banking, unless the branches were within the same county. First Republic–Dallas was the holding company's "flagship" bank, and was much larger than its other banks. Paschall testified that he had conveyed his reservations about First Republic–San Antonio's lack of experience in handling ESOPs to Brecher, and that Paschall had indicated that the two banks were part of the same system and were able to share resources and expertise.

that the "whole First RepublicBank network" was available to supervise the spin-off ESOP. Caplin and the other directors knew of First RepublicBank's expertise because of the attempted leveraged buy out of FAC in 1986, in which RepublicBank played a major role. According to Caplin, it was explained to the board that FAC management wanted a local bank, with local representatives that they could talk to. The board was assured, however, that investment decisions would be supervised by First Republic–Dallas.

This arrangement is consistent with the testimony of every witness, other than Paschall. Gary Howell, GMF"s ERISA counsel, testified that John Herbots, FAC's vice-president for finance, first suggested First RepublicBank as trustee. Howell stated that, when he first discussed the matter with Richard Coleman, Coleman represented that First Republic–San Antonio was trustee for many ESOPs, and that "they had a lot of back-up capability in their home office." Howell testified that, "I think I always assumed that First Republic was one entity. . . . I didn't distinguish between San Antonio and Dallas as separate banks." (Howell Dep. at 29–30).

Richard Coleman, trust officer at First Republic–San Antonio, explained his understanding of the relationship between the banks as it related to the FAC/Crestview ESOP:

> Q. Do you recall in the time frame of January 1988, having a discussion with Marty Weiland with respect to whether it was acceptable for First RepublicBank to take on this account; to perform trustee services in connection with the proposed transactions?
> A. Yes.
> Q. Okay. What do you recall about that conversation with Mr. Weiland?
> A. I recall that there was no problem with us taking on what he thought was a client. There was some discussion as to who was going to act as the point trustee, if you will. Was it going to be the Dallas office or was it going to be the San Antonio office. Mr. Weiland apparently had conversations with Mr. Brecher in Atlanta, and it was originally envisioned, I think, it

was intended that RepublicBank–Dallas be [sic] the trustee. And the people on the ground at Fairchild Aircraft preferred to have somebody local that they could call on to be the trustee. I think they finally reached a compromise where the plan would be handled locally with expertise and support coming out of Dallas.

> Q. That's what Mr. Weiland told you?
> A. Yes.
> Q. Did he identify who Mr. Brecher was?
> A. I think he did. He said he was the counsel for Fairchild Industries.

(Coleman Dep. at 33–34).

Most important, Fairchild's understanding of the relationship between the banks is plainly consistent with the way the banks held themselves out. Marketing publications which were given to potential customers refer to "First RepublicBank," with no distinction between Dallas, San Antonio, or any of the separate banks. (Def.'s Ex. 45). First RepublicBank touted itself as the "Employee Benefits Bank of the South . . . with Trust assets exceeding $55 Billion . . . 112 years of experience . . . 1,300 Trust professionals is [sic] among the Nation's leading Investment/401(k) Firms and the largest Employee Benefit/Master Trust/Custody Bank in the South." These figures—$55 billion in assets, 1,300 trust professionals—represented the aggregate of all the banks in the First RepublicBank system, not of any one bank alone.

These promotional materials convey the unmistakable message that any trust customer of First RepublicBank is a customer of a single entity: "First RepublicBank Trust." The potential customer is led to believe that all of the resources of "First RepublicBank Trust" are at its disposal, regardless of whether that customer deals with the San Antonio or Dallas (or any other) First RepublicBank office. Paschall explained that, in fact, there was no separate legal entity known as "First RepublicBank Trust." Rather, that entity represented the combined trust services and assets of all the First RepublicBank offices.

Richard Coleman, trust officer at First Republic–San Antonio, provided these promotional materials to Herbots and Howell when FAC and GMF were considering potential trustees for the GMF ESOP and the FAC/Crestview ESOP. In a cover letter to Herbots, a copy of which was sent to Howell, Coleman states, "I have enclosed material which addresses trust and investment services *we offer at First RepublicBank.*" (Def.'s Ex. 45) (emphasis added). After seeing this material, Howell was understandably impressed with First RepublicBank's credentials; he did not distinguish between the Dallas and San Antonio banks:

> Q. Turn to the next page [of Def.'s Ex. 45] where it refers to First Republic Bank, the employee benefit bank itself with trust assets exceeding 55 billion, 112 years of experience, 1300 trust professionals, is [sic] among the nation's leading investment 401k firms and the largest employee benefit master trust custody bank in the south.
>
> Is that the institution that Mr. Coleman represented would be doing this transaction with respect to the potential ESOP?
>
> A. Yes. Mr. Coleman was a trust officer for First Republic, and this is First Republic. Again, I was not thinking in terms of separate independent banks. It was always that you were dealing with First Republic which was this huge entity.

(Howell Dep. at 30–31). Brecher, Fairchild's ERISA counsel, testified that he received materials which were substantially similar to Defendant's Exhibit 45 when he worked with RepublicBank, First RepublicBank's predecessor, in 1986.

This evidence leads me to conclude that the defendants had a reasonable, good faith belief that they had selected a trustee with the expertise of the entire First Republic-Bank system. All of the parties to this transaction looked to the First RepublicBank system as a whole, and not just the San Antonio office, to act as trustee of the FAC/Crestview ESOP. Brecher and the Fairchild Directors had personal knowledge of First RepublicBank's integrity and competence.

Indeed, First RepublicBank's integrity and competence were not seriously disputed at trial. Rather, the plaintiff's challenge to the trustee was that First Republic–San Antonio was in some sense a "compliant trustee." This was not borne out by the proof at trial. It was not proven that First Republic–San Antonio had anything other than an arms-length relationship with GMF, much less that the defendants should have known, or suspected, that that might be the case. Rather, the greater weight of the evidence established that the defendants selected a trustee that was both competent and independent.

This, coupled with the defendants' understanding that the integrity of the member-directed funds was protected in the spin-off plan, as it had been in the prior plan, leads me to conclude that the defendants fulfilled the duties they owed as fiduciaries of FAC and Crestview employees. The preponderance of the evidence established that the investment in GMF stock of assets from the Interest Income and Equity Funds Subaccounts was grossly imprudent. A preponderance of the evidence established that the stock purchase also violated the FAC/Crestview ESOP Plan and Trust Agreement. That stock purchase, however, was the action of the trustee, First Republic–San Antonio, and not of Fairchild. Specifically, it appears to me to have been due to the inexperience of Coleman and the absence of ESOP expertise within First Republic–San Antonio.

█ Finally, I conclude that this is not a case where co-fiduciary liability should be imposed upon the defendants for the imprudent act of First Republic–San Antonio. *See* 29 U.S.C. § 1105(a). When First Republic–San Antonio executed the contract for the purchase of GMF stock, Fairchild had ceased acting as a fiduciary with respect to the FAC/Crestview ESOP. On March 1, 1988, GMF replaced Fairchild as the plan sponsor of the FAC/Crestview ESOP, and GMF"s board of directors replaced Fairchild's directors as fiduciaries.

First Republic–San Antonio became a fiduciary of the new ESOP on March 4, 1988, when it was appointed trustee. Fairchild's last arguably-fiduciary act was to direct Mellon Bank to transfer assets from the Fairchild ESOP to the FAC/Crestview ESOP.

Factually, then, First Republic–San Antonio and Fairchild were not co-fiduciaries of the FAC/Crestview ESOP beneficiaries at the point when the stock purchase was made. I find no basis in the law for imposing liability upon the defendants for an improvident investment decision made after they had ceased acting as fiduciaries, a decision which was made by an independent, competent trustee.

### IV. CONCLUSION

As is set forth above, it was not proven by a preponderance of the evidence that the defendants breached the fiduciary duties they owed to the participants of the FAC/Crestview ESOP. The defendants acted reasonably, prudently, and with loyalty to the plan participants when they spun-off the new ESOP and selected an independent, competent trustee to invest the ESOP's assets. That is what ERISA required of them.

The evidence strongly suggests that the imprudence of using conservatively-invested assets in member-directed subaccounts to purchase GMF stock was solely the fault of the trustee, and not of the defendants. It was not proven that the defendants knew or should have known that the trustee would make such an investment decision. Indeed, it was proven to my satisfaction that the defendants reasonably believed that such an investment was prohibited by the FAC/Crestview ESOP Plan Document and Trust Agreement.

Accordingly, the Clerk is directed to enter final judgment in favor of the DEFENDANTS, and against the PLAINTIFF, together with taxable costs.

DONE AND ORDERED.